# UNITED STATES DISTRICT COURT
for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Use of a Cell-Site Simulator to Locate the Cellular Device Assigned Call Number (414) 779-3186 | Case No. 22-1839M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before   12/5/2022   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Honorable Nancy Joseph   .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for  30  days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   11/21/2022 @ 10:04 a.m.

*Judge's Signature*

City and state:   Milwaukee, WI         Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

### Certification

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

                                                                *Executing officer's signature*

                                                                        *Printed name and title*

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number (414) 779-3186, whose user is SAMONE THOMAS.

# ATTACHMENT B

Pursuant to an investigation of PRECIOUS CRUSE for a violation of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and
2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. Seizure of TCP-1 has, however, been authorized by a separate warrant that was issued by the Court on November 16, 2022. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

2

Case 2:22-mj-01839-NJ   Filed 11/21/22   Page 4 of 19   Document 1

# UNITED STATES DISTRICT COURT

for th
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Use of a Cell-Site Simulator to Locate the Cellular<br>Device Assigned Call Number (414) 779-3186 | ) ) ) ) ) ) | Case No. 22-1839M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1347 and 1035; 42 U.S.C. Section 1320a-7b | Healthcare Fraud: False Statements Related to Healthcare: Illegal Kickbacks |

The application is based on these facts:
See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Jill Dring
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ __telephone__ _____ *(specify reliable electronic means)*.

Date: 11/21/2022

_____
*Judge's signature*

City and state: Milwaukee, WI       Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Jill Dring, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular device assigned call number (414) 779-3186, ("**Target Cellular Device**" or "**TCP-1**"), which is described in Attachment A.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since March of 2013. As a Special Agent, I investigate civil and criminal matters related to health care fraud involving violations of the Health Care Fraud Statute, False Claims Act, Anti-Kickback Statute and Stark Law. Prior to investigating health care fraud matters, I investigated criminal and national security related computer intrusion matters involving botnets, distributed denial of service attacks, the distribution of SPAM, malicious software, the theft of identification information, and other computer-based fraud. I have received training in computer technology, computer-based fraud and health care fraud.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. One purpose of applying for this warrant is to determine with precision the Target Cellular Device's location. However, there is reason to believe the Target Cellular Device is currently located somewhere within this district because **TCP-1** was observed by case agents in the district yesterday in the possession of SAMONE THOMAS who is a resident of Milwaukee and also because cell-site data was obtained today from the execution of a warrant that was issued yesterday, which places **TCP-1** in the city of Milwaukee. Pursuant to Rule 41(b)(2), law enforcement may locate the **TCP-1** outside the district provided the device is within the district when the warrant is issued.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks) have been committed, are being committed, or will be committed by PRECIOUS CRUSE (DOB: 06/07/1993) and others known and unknown to the case agents. There is also probable cause to believe that the location of **TCP-1** will assist law enforcement in obtaining **TCP-1**, which contains evidence of those criminal violations.

6. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

**PROBABLE CAUSE**

7. On 9/28/21, members of the Medicaid Fraud Control & Elder Abuse Unit (MFCEAU), were assigned Department of Justice Investigation case number 2021-07738, involving a credible allegation of fraud referral from Department of Health Services (DHS) Office of the Inspector General (OIG) pertaining to Caring Through Love, a Prenatal Care Coordination (PNCC) agency owned by PRECIOUS CRUSE. A Prenatal Care Coordination (PNCC) agency is an agency that provides services to pregnant women who are at high risk for adverse pregnancy outcomes. PNCC services are reimbursed under Wisconsin Medicaid when provided in accordance with Wisconsin Medicaid's rules and regulations. Covered services related to PNCC services are listed in Wis. Admin. Code § DHS 107.34.

8. Per Wis. Admin. Code § DHS 107.34, PNCC agencies are required to have a Qualified Professional. Prior to services being performed for a Medicaid recipient by a PNCC, and the subsequent reimbursement by Wisconsin Medicaid, an initial assessment and care plan are required. The Qualified Professional reviews and signs the assessment.

9. The PNCC program requires providers to submit accurate and truthful claims for payments. It also requires a provider to only seek reimbursement for the actual amount of time spent assisting a member. And it prohibits providers from seeking reimbursement for non-covered services. Examples of non-covered services include personal comfort items such as radios and television sets. DHS 107.03(6). Additionally, DHS has explained that if a client is in need of something like diapers or wipes, a care coordinator should connect the client with an organization that can provide those items, rather than providing them. The PNCC program prohibits seeking reimbursement for noncovered services by charging for a covered service that was not actually provided.

10. On 9/28/21, MFCEAU accepted a credible allegation of fraud referral from DHS OIG. The allegations stated that Caring Through Love, LLC (CTL), offered illegal incentives to its members and/or prospective members to enroll in the program. Additionally, there are allegations that CTL, intentionally made false statements or representations of material facts on a claim to obtain payment for services provided without the supervision of a Qualified Professional.

11. According to records kept by DHS in the regular course of its official business, Vivian Mealing, RN, is listed as the Qualified Professional at CTL. Barbara Hayden, an OIG nurse consultant, contacted Vivian Mealing, and during a conversation that occurred on 4/1/21, Mealing informed Hayden that she has yet to perform any services for CTL.

12. DHS launched and completed an investigation prior to sending MFCEAU the credible allegation of fraud. DHS reviewed Facebook posts of Presh Hutchinson that appeared to offer monetary incentives to clients for Mother's Day. As substantiation for the allegation, DHS OIG provided a screenshot or screen capture of the Facebook post made by Presh Hutchinson. A screenshot or screen capture is a digital image that shows the content of a computer or digital display.

13. Case agents reviewed the screenshot provided by DHS OIG. The screenshot in question is a Facebook post from 05/27/2021, posted under the account of Presh Hutchinson. It reads, "Happy Mother's Day To All the Clients Enrolled With Caring Through Love LLC We Appreciate Yall, & I hope Yall Enjoy Your Gifts From Us & Your Day." A photograph and video are attached to the post. In the photo, and screen still from the video, there is $100 in $20 bills in a card.

14. Based on my training and experience, I know that Wisconsin Medicaid does not allow monetary incentives to potential or existing clients, and it is viewed as an illegal

incentive, or a kickback. The Wisconsin Medicaid Provider Agreement and Acknowledgement of Terms of Participation (WMPAATP), set forth by Wis. State § 49.045(2)(a)9, and Wis. Admin Code §DHS 105.01, state that a provider, in this case CRUSE and CTL understands and agrees that every time the provider signs and submits a claim, the provider certifies that the provider has not offered, paid, or received any illegal remuneration or any other thing of value in return for referring an individual to a person for the furnishing of any service or item, or for arranging for the furnishing of any service or item for which payment may be made in whole or in part under Medical Assistance in violation of 42 U.S.C. § 1320a-7b, Wis. Stat. § 946.91(3), or any other federal or state anti-kickback statutes. The WMPAATP was signed by CRUSE on 02/04/2021.

15. Case agents reviewed Wisconsin Medicaid records kept by DHS in the regular course of its official business and learned that CRUSE is the current and past owner of CTL. Case agents confirmed that CRUSE was the owner of CTL, at the times of the suspect posts.

16. In February 2022, I joined MECEAU's investigation of CTL.

17. On October 3, 2022, I, along with MECEAU investigator Rory O'Sullivan interviewed Tia Imes, who was a registered client of CTL. CTL business records demonstrated that SAMONE THOMAS was Tia Imes' care coordinator. CTL billed $1,056 to Medicaid for PNCC services purportedly provided to Ms. Imes on 10 separate dates. Ms. Imes told investigators that she signed up for services with CTL at a "community baby shower" at which she received diapers, wipes, and a pack 'n play. Ms. Imes said that she was never thereafter contacted by anyone with CTL and received no services. The first day of service billed for Ms. Imes was August 6, 2021. Ms. Imes states that she was in the hospital recovering from the birth of her child that day and did not meet anyone from CTL that day.

5

18.     On October 3, 2022, I, along with MECEAU investigator Rory O'Sullivan, interviewed Tenisha Woulard. Woulard was a client of CTL. CTL billed $2,112 for services purportedly provided to Ms. Woulard on 22 separate occasions. She indicated during the interview that she received no services and only had one meeting with a representative from CTL. THOMAS was listed as Ms. Woulard's care coordinator.

19.     On October 3, 2022, I, along with MECEAU investigator Rory O'Sullivan, interview three other women for whom CTL submitted billing claims to Medicaid for PNCC services purportedly provided by THOMAS. All the women indicated that they received no coordination services. Some indicated that they received outfits, diapers, and fireworks. We showed these clients billing records describing meetings and services purportedly provided. Each denied that the meetings occurred or that the services were provided. At least one woman interviewed denied knowing THOMAS.

20.     On November 16, 2022, I, along with Rory O'Sullivan and AUSAs Julie Stewart and Kate Biebel, interviewed THOMAS. During the meeting, she produced her cellular phone, an Apple iPhone, and consulted it on several occasions to view photos and videos while responding to our questions. I know the phone number associated with THOMAS's iPhone is (414) 779-3186; I know this because AUSA Stewart called THOMAS on that number, which THOMAS previously provided, on the morning of November 16, 2022 to confirm the meeting. THOMAS stated she forgot and asked AUSA Stewart to text her the address of building where the meeting was to take place. AUSA Stewart sent a text message to that number with the information THOMAS had requested, and THOMAS soon thereafter arrived at the address AUSA Stewart had provided. After the meeting ended, I sent a text message to THOMAS at that number and she responded.

6

21. During the meeting, THOMAS indicated that the woman who denied knowing her was "her cousin." She also said that it was not true that she provided no services to these women.

22. THOMAS acknowledged during this meeting, however, that the billing records that contained her name and described services provided were not accurate or truthful. She said that the entries in those records were written or provided by CRUSE. Each entry on the forms showed to THOMAS stated that THOMAS met with a particular client for 2 hours. Many records included an entry for a 2-hour meeting multiple times in a month. THOMAS denied meeting with her clients for two hours at a time on that many occasions. She said she typically contacted her clients once per month. She said that she did not fill out the forms or submit those billings and that CRUSE was responsible for doing so.

23. THOMAS acknowledged that she did not know Ms. Imes and likely did not provide services to her.

24. THOMAS stated that she was not provided training on how to provide services to her clients or told what to do. She stated that many of her clients told her that they did not need any prenatal care coordination services. As a result, she tried to give them something else they might need by, for example, giving their children fireworks for the Fourth of July.

25. During the interview on November 16, 2022, THOMAS stated that she had communications with CRUSE over Facebook and via text. She thought she may have deleted the text messages, but believed she might still have the Facebook communications on her phone.

26. During the interview on November 16, 2022, THOMAS stated that she had used her phone to video-record a meeting in which CRUSE "did the billing" for the PNCC CTL. She stated that she attended such sessions on a monthly basis during her employment at CTL,

which she indicated spanned from June 2021 to sometime in August 2021. Ms. Thomas stated that she filmed this meeting on August 6, 2021 during which CRUSE "did the billing" because she was not taking notes. She said that CRUSE explained how to fill out the billing sheets. THOMAS told investigators that CRUSE told her not to film it, but that she did anyway. THOMAS showed investigators portions of that video during the interview. During those portions, the screen showed an image of a billing record that included time spent and a description of a service provided. CRUSE could be heard on the video instructing the coordinators not to change the sections that detailed the service provided and to only change the portion of the document that included the care coordinator's name and client's name. THOMAS explained that this was standard – that the billing forms all included essentially the same information for services provided and that CRUSE documented the time spent (almost always 2 hours), and that care coordinators were instructed to only fill in their names and their client names on these billing records.

27. THOMAS also stated that in August 2021, CRUSE paid for her, and other care coordinators, to travel to Las Vegas. THOMAS stated that Ms. Cruse paid for the hotel and flights. THOMAS stated that she had photographs of that trip on her phone.

28. Initially, THOMAS agreed to provide the videos to investigators, but at some point during the meeting, she decided she no longer wanted to speak to law enforcement and ended the interview without providing those videos.

29. Based on the interview with THOMAS's purported clients and THOMAS, it is clear that the billing records used to submit claims for payment to Medicaid by CTL were false.

8

30. The evidence on THOMAS's phone, particularly the video of CRUSE "doing billing" and teaching care coordinators how to fill out billing records is evidence of health care fraud in violation of 18 U.S.C. 1347.

31. Investigators from MECEAU reviewed information in the Medicaid Provider Database, kept by DHS in the regular course of its official business, and learned that CTL has had all reimbursement payments directly deposited into an account at US Bank since 03/19/2021. CTL received reimbursements from Wisconsin Medicaid totaling at least $1,063,022.22.

32. Case agents believe that monitoring of **TCP-1's** location until TCP-1 is located and seized will assist in identifying a place where the phone can be seized and searched, subject to legal process, for evidence of the crimes discussed herein.

33. On November 16, 2022, this Court issued two warrants related to **TCP-1.** The first permitted agents to obtain cell-site location information. The second permitted law enforcement to search the person of THOMAS to locate **TCP-1** and to search that device. Agents have since obtained the cell site information granted by the first warrant, but that information has provided a fairly large radius of over half a mile in a relatively densely populated area of the city. That location information has been insufficient for agents to locate THOMAS, particularly given the desire to reduce the intrusiveness of the search by finding her outside, in public. Because of that, agents believe that the more precise location information sought in this warrant is necessary.

## MANNER OF EXECUTION

34. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving

a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

35. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

36. The investigative device may interrupt cellular service of phones or other cellular devices within its range. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its range. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further

order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

## AUTHORIZATION REQUEST

37. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

38. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and [continue to] flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

39. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

11

40. A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

# ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number (414) 779-3186, whose user is SAMONE THOMAS.

# ATTACHMENT B

Pursuant to an investigation of PRECIOUS CRUSE for a violation of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and
2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. Seizure of TCP-1 has, however, been authorized by a separate warrant that was issued by the Court on November 16, 2022. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).